Alan MEYER, Trustee for Paul D. Meyer, M.D., P.A. Money Purchase Pension Plan and Trust, et al.

v.

**BERKSHIRE LIFE INSURANCE COMPANY**

No. CIV.A. CCB–99–1432.

United States District Court,
D. Maryland.

March 31, 2003.

Barrett W. Freedlander, Saul Ewing, LLP, Baltimore, MD, Nicholas T. Christakos, David A. Last, Steuart H. Thomsen, Sutherland Asbill and Brennan, LLP, Washington, DC, for Berkshire Life Ins. Co.

Mark Menton Dumler, Brian C. Parker, Parker, Dumler and Kiely, LLP, Baltimore, MD, for Jorge R. Ordonez and Alan Meyer.

## *MEMORANDUM*

BLAKE, District Judge.

Plaintiffs Alan Meyer[1] and Jorge R. Ordonez ("Plaintiffs" or "Doctors" or

---

1. The individual plaintiffs originally named in this suit were Paul D. Meyer, M.D., and Jorge R. Ordonez, M.D. On March 22, 2002, however, the court granted the plaintiffs' Motion to Substitute Alan Meyer, Trustee for Paul D. Meyer, M.D., Trustee as Nominal Plaintiff for the Paul D. Meyer, M.D., P.A. Money Purchase Pension Plan and Trust, due to the

"Trustees") allege that defendant Berkshire Life Insurance Company ("Defendant" or "Berkshire") mismanaged their pension fund.[2] Following the court's summary judgment order, only Count V of the plaintiffs' amended complaint, which asserts damages for breach of fiduciary duties pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), remained against the defendant.

A six-day bench trial on the ERISA claims was held before this court. After hearing the evidence and considering the post-trial briefs, the court concludes that the plaintiffs have proven their ERISA claims. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following memorandum constitutes the court's findings of fact and conclusions of law.

In 1980, Dr. Paul Meyer and Dr. Jorge Ordonez left the neurosurgery practice in which they were employed and opened separate but affiliated practices. At that time, the doctors placed the money they received from their pension plans on deposit at a local bank. They hired Alan N. Kanter to complete all the reporting pertaining to the funds because he did the pension plan reporting at the former neurosurgery practice. (Ordonez Tr. 3/21/02 at 310–11; Def.'s Ex. 9, 39.) The doctors asked Kanter to invest the pension plan funds for them, but Kanter advised them that he was not qualified to invest or manage funds; he could only do the reporting function. (Ordonez Tr. 3/21/02 at 311.) The doctors, therefore, were interested in retaining someone who could invest and manage the funds for them. (Ordonez Tr. 3/21/02 at 311–12.)

The doctors had become acquainted with Michael Meszaros, an officer at the local bank where the pension plan funds were deposited. (Ordonez Tr. 3/21/02 at 311–12.) In 1983, Meszaros left the bank to work for Berkshire as an agent. (Meszaros Tr. 3/20/02 at 89.) While he worked for many years as a bank branch manager, he had no financial planning experience or training prior to his employment at Berkshire. (Meszaros Tr. 3/20/02 at 94–95.) Meszaros does not have a college degree or any certifications. (Meszaros Tr. 3/20/02 at 94–98.)

In 1983, Meszaros set up a meeting between himself, the doctors, and Robert Walsh, the general agent for Berkshire in the Baltimore area. The purpose of that meeting was to acquaint the doctors with the insurance and retirement services offered by Berkshire. At the meeting, Meszaros held himself out as a representative of Berkshire and stated that he could manage and invest the doctors' pension plan funds. (Ordonez Tr. 3/21/02 at 312; Meszaros Tr. 3/20/02 at 90–92, 107–08.) Meszaros understood that Kanter was unable to give investment advice and that the doctors wanted to retain someone who could invest and manage the funds for them. (Meszaros Tr. 3/20/02 at 110–11, 205.) Meszaros assured the doctors that Berkshire would handle everything pertaining to the pension plans. (Meszaros Tr. 3/20/02 at 108) ("... we do all this for you. You don't have to do it. We do it"); *see also* Pls.' Ex. 28 ("for as long as you

---

death of Paul D. Meyer. While the plaintiffs did not indicate that Alan Meyer is a physician, the court may refer to the plaintiffs collectively as "Doctors" in this opinion, for the sake of consistency with the other opinions issued in this case.

**2.** The other orders issued in this case, namely the summary judgment order, *see Meyer v. Berkshire Life Ins. Co.*, 128 F.Supp.2d 831 (D.Md.2001), and the order granting Plaintiffs' Motion to Dismiss Counterclaim, are incorporated herein by reference, to the extent relevant.

allow us the priviledge [sic] of acting as your plan administrator, all of these services will be performed at our local agency here in Baltimore"). In addition, Meszaros predicted at the initial meeting that each of the pension plans would be worth approximately $2 million by the end of the doctors' careers.[3] (Meszaros Tr. 3/20/02 at 126–29; Ordonez Tr. 3/21/02 at 312–13, 322, 345–46; Pls.' Ex. 20–21; Def.'s Ex. 6.)

The doctors decided to retain Berkshire to manage their pension plans. (Ordonez Tr. 3/21/02 at 320.) Two plans were established, one for each doctor and his staff. (Pls.' Ex. 63, 66.) The doctors were named the trustees of their respective plans. (Ordonez Tr. 3/21/02 at 322–23, 344; Pls.' Ex. 63, 66.) They rolled over their pension funds from the former neurosurgery practice into their new Berkshire pension plans. (Ordonez Tr. 3/21/02 at 320; Jones Tr. 3/21/02 at 277.) The doctors made annual contributions to Berkshire ranging from approximately $20,000 to $40,000. (Dodge Tr. 3/21/02 at 401; *see also* Pls.' Ex. 20, 63, 66.) At some point, however, Dr. Ordonez was unable to contribute the maximum amount to the pension plan. (Ordonez Tr. 3/21/02 at 349–50; Meszaros Tr. 3/20/02 at 219.) The doctors' relationship with Berkshire extended from 1983 to sometime in 1997. (Jones Tr. 3/21/02 at 290–93; O'Malley Tr. 3/22/02 at 522, 553, 559; Pls.' Ex. 52, 63, 66.)

Throughout this time period, Meszaros represented himself as a financial advisor and representative of Berkshire. (Stepanek Tr. 3/21/02 at 257; Jones Tr. 3/21/02 at 294, Ordonez Tr. 3/21/02 at 337; Meszaros Tr. 3/20/02 at 90, 92–93, 104–05, 205.) Meszaros alone generated the investment strategies; the doctors never approached Meszaros or any other Berkshire agent with investment suggestions or directives. (Meszaros Tr. 3/20/02 at 92, 157–58; Ordonez Tr. 3/21/02 at 323–24.) The doctors trusted Meszaros and deferred entirely to his decisions. (Ordonez Tr. 3/21/02 at 325–26; Shanahan Tr. 3/20/02 at 62, 86; Meyer Dep. 3/28/00 at 101–04, 107–08, 117–18, 120, 137–38, 144, 167–68, 199–200.)

Transactions typically were executed in the following manner. After Meszaros made an investment decision, he delivered papers to the doctors' offices for their signatures. (Ordonez Tr. 3/21/02 at 326, 330–31; Meszaros Tr. 3/20/02 at 157–58.) Meszaros typically did not discuss with the doctors the nature of the investments being made or any ensuing transaction costs or penalties. (Ordonez Tr. 3/21/02 at 326–27, 331–36.) The doctors signed the papers, usually without questioning what they were executing. (Ordonez Tr. 3/21/02 at 326–27, 330–31, 338, 353, 359–60.) Many times, Meszaros delivered blank forms to the doctors' offices and inserted the pertinent information only after the doctors' signatures were obtained.[4] (Ordonez Tr. 3/21/02 at 327; Stepanek Tr. 3/21/02 at 249, 255, 266; Jones Tr. 3/21/02 at 287.) In addition, Meszaros often telephoned the doctors' offices and asked their secretaries to prepare checks payable to Berkshire in various amounts. (Jones Tr. 3/21/02 at 280–81.) The doctors did not question Meszaros, but rather instructed their secretaries to draft checks per Meszaros's requests. (Jones Tr. 3/21/02 at 281.)

---

**3.** The $2 million figure (specifically, $2,216,786 for Dr. Ordonez's plan) seems to include the value of the life insurance coverage, but apparently excludes the doctors' initial contributions (i.e., the funds representing their pensions from the former neurosurgery practice (approximately $279,000 for each plan)). (Meszaros Tr. 3/20/02 at 124–25; Pls.' Ex. 20, 21; Def.'s Ex. 120, 121.)

**4.** Dr. Ordonez testified that, during the course of discovery in this litigation, he was presented with a document on which his signature was forged. (Ordonez Tr. 3/21/02 at 329.)

Meszaros and Walsh scheduled some in-person meetings with the doctors, but they routinely lasted approximately 15 to 20 minutes or less.[5] (Jones Tr. 3/21/02 at 279; Ordonez Tr. 3/21/02 at 320–21; Shanahan Tr. 3/20/02 at 57–58; Meyer Dep. 3/28/00 at 27–28, 45–46, 59.)

As stated, the plaintiffs allege that Berkshire mismanaged their pension plans. Specifically, the plaintiffs assert that Berkshire: (1) overloaded the plans with life insurance policies; (2) failed to diversify the plans' assets and instead placed them almost exclusively in low-yielding investments; and (3) rapidly transferred or "churned" the plans' assets from one investment to the next, incurring substantial surrender fees, charges, and commissions in the process.

Regarding the first issue, Berkshire required that between 25% and 49.99% of Dr. Meyer's contributions to his pension plan, and between 30% and 49.99% of Dr. Ordonez's contributions to his pension plan, be put into life insurance policies. (Meszaros Tr. 3/20/02 at 99–100, 116–17, 222; Shanahan Tr. 3/20/02 at 61; Dodge Tr. 3/21/02 at 387; O'Malley Tr. 3/22/02 at 519; Pls.' Ex. 20, 63, 66.) While insurance is not necessarily considered as an investment (Meszaros Tr. 3/20/02 at 113; *cf.* MacNab Tr. 4/16/02 at 98–99, 148), Berkshire used its pension plans as a vehicle for

selling its life insurance. (Meszaros Tr. 3/20/02 at 99–100, 102–03; *see also* Pls.' Ex. 17 at 3) ("A *Pension Plan* is a *vehicle for* the *sale* of *many insurance policies* at *one time,* which develop *significant premiums* and *commissions.* Commissions are high because *permanent life insurance* is used rather than term. Pensions are *daytime activity* involving business people. Pension plans have *persistency.* Finally, there are *automatic increases,* which can be *substantial,* and *by-product sales* such as key employee, split-dollar, buy-sell, salary continuation and individual sales to plan participants") (emphasis in original). The doctors understood that life insurance was a required component of Berkshire's pension plans; in fact, Berkshire did not charge an administrative fee for its services in exchange for the insurance requirement. (Ordonez Tr. 3/21/02 at 314–15, 354; Pls.' Ex. 20, 63, 66.) No Berkshire representative, however, conducted any analysis of the plan participants' need for life insurance.[6] (Meszaros Tr. 3/20/02 at 116–17; Jones Tr. 3/21/02 at 283–84; Ordonez Tr. 3/21/02 at 316–18.)

The following three experts testified at the trial regarding, *inter alia,* the advisability of the amount of life insurance purchased by Meszaros and its location inside the pension plans: Donald Dodge and JJ

---

**5.** At annual meetings, which were attended by the doctors, Meszaros, and Walsh, the doctors were shown only the plans' bottom lines, as compared to the prior year; there was virtually no discussion of individual transactions or investment strategies. (Ordonez Tr. 3/21/02 at 321–22; Meszaros Tr. 3/20/02 at 190; Shanahan Tr. 3/20/02 at 52.) Dr. Ordonez testified that he was satisfied merely seeing the plans' bottom lines increase, by any degree, from one year to the next. (Ordonez Tr. 3/21/02 at 321–22.)

**6.** For instance, Dr. Meyer was never married and had no children. (Ordonez Tr. 3/21/02 at 317–18.) He needed, therefore, very little or

no life insurance (Dodge Tr. 3/21/02 at 388–90, MacNab Tr. 4/16/02 at 152, MacNab Tr. 4/26/02 at 710–12), but Meszaros never inquired about his personal situation or insurance needs. (Meszaros Tr. 3/20/02 at 116–17.) Linda Shanahan, Dr. Meyer's secretary, testified that she had three life insurance policies at one point. She felt this was excessive and she was concerned that she would be unable to pay the premiums upon retirement. When Meszaros approached Shanahan in 1995 or 1996 and informed her that she was required to take a fourth life insurance policy in her name, she refused to sign the papers. (Shanahan Tr. 3/20/02 at 84–85.)

MacNab for the plaintiffs, and Alexander Scott Logan for the defendant.[7] Unlike the other experts, Logan did not scrutinize the actual rates of return achieved by the pension plans. (Logan Tr. 4/16/02 at 16) (In response to the question, "And you have not taken with respect to the insurance policies, you haven't made a determination with respect to the rate of return on the insurance policies, correct," Logan responded, "Again, I have only accepted what's been reported to me on the rate of return and the internal rate of return on the policies.") Instead, Logan focused his inquiry primarily on the hypothetical appropriateness of carrying life insurance inside pension plans. (Logan Tr. 3/22/02 at 569–76, 578–79.) While Logan concluded that life insurance was an appropriate component of the doctors' pension plans because of portability, rating, taxation, and administrative cost concerns (Logan Tr. 3/22/02 at 569–76, 578–79), in view of his failure to scrutinize the actual rates of return on the various components in the doctors' pension plans, MacNab's rebuttal testimony responding to Logan's opinions is more persuasive. (MacNab Tr. 4/16/02 at 150–53.) In addition, Logan's opinion that Meszaros conducted an appropriate assessment of the plan participants' need for life insurance (Logan Tr. 3/22/02 at 576–77) is undermined by Meszaros's own frank admission that he did not conduct any analysis of the participants' need for life insurance. (Meszaros Tr. 3/20/02 at 116–17.) Finally, Logan's opinion regarding the appropriateness of life insurance in the doctors' plans was colored by various dubious assumptions, including, but not limited to, that Meszaros and Walsh functioned primarily as "insurance agents," never holding themselves out as "invest-ment advisors or investment managers" (Logan Tr. 3/22/02 at 596, 600–01), that the doctors expressed investment objectives and Meszaros purposefully chose investments to match those goals (Logan Tr. 3/22/02 at 596–97; Logan Tr. 4/16/02 at 26–27), and that Berkshire and Meszaros were not plan fiduciaries, unlike the doctors themselves (Logan Tr. 3/22/02 at 600–01, 609–10, 625–27). As set forth in this opinion, those assumptions were proven largely incorrect by the evidence at trial.

Both Dodge and MacNab expressed opinions regarding the life insurance components in the pension plans and conducted analyses of the insurance policies' rates of return from 1983 to 1996. Dodge persuasively explained that financial advisors should assess various factors, including participants' assets, liabilities, disposable income, investment goals, number of dependents, and age, in order to determine the appropriate amounts of life insurance for them. (Dodge Tr. 3/21/02 at 377–82, 386.) Again, as stated, Meszaros conceded that he did not conduct any such analysis with regard to the plan participants in this case. (Meszaros Tr. 3/20/02 at 116–17.) Dodge further opined that it is not prudent to place excessive funds into life insurance policies inside pension plans because such funds could be invested in more productive investment products instead. (Dodge Tr. 3/21/02 at 382–83, 387–88, 391; *see also* MacNab Tr. 4/16/02 at 147–49; MacNab Tr. 4/26/02 at 671–77; Pls.' Ex. 106 at Ex. A, Ex. B) (explaining the Feingold Settlement as a tool for assessing the advisability of having life insurance inside pension plans, concluding that "as long as the internal rate of return on the [insurance] contract offered a fair

---

7. Dodge is a Chartered Life Underwriter (CLU) and a Chartered Financial Consultant. (Dodge Tr. 3/21/02 at 369–70.) MacNab is a certified financial planner (CFP), CLU, insur-ance analyst, and owner of Insurance Barometer, LLC. (MacNab Tr. 4/16/02 at 96–97.) Logan is an attorney, CFP, and consultant. (Logan Tr. 3/22/02 at 528–29.)

rate comparable to federal midterm rates then it was acceptable"). In addition, Dodge noted that the participants' life insurance policies were costly due to very high commissions, ranging from 55% to 100%. (Dodge Tr. 3/21/02 at 384–85; *see also* Pls.' Ex. 17 at 3) (insurance policies "develop *significant premiums* and *commissions.* Commissions are high because *permanent life insurance* is used rather than term.") (emphasis in original). MacNab further stated that the life insurance policies in the doctors' plans were "old fashioned whole life contracts," which had "very low" rates of return, albeit guaranteed rates of return. (MacNab Tr. 4/16/02 at 155.) Accordingly, Dodge and MacNab concluded that maintaining such high levels of life insurance in the doctors' pension plans had a negative overall effect on the plans' performance. (Dodge Tr. 3/21/02 at 382, 387–88, 391; MacNab Tr. 4/16/02 at 150–53.)

As stated, Dodge and MacNab also scrutinized the actual rates of return of the life insurance policies carried within the doctors' pension plans. Dodge estimated that the overall rate of return of the insurance policies was less than 1% for each pension plan. (Dodge Tr. 3/21/02 at 386; Dodge Tr. 3/22/02 at 498–500.)[8] MacNab concluded that the insurance policies in Dr. Meyer's plan had a total rate of return of approximately 1% from 1983 to 1996. (MacNab Tr. 4/16/02 at 149–50; Pls.' Ex. 106.) The total rate of return of the life insurance policies in Dr. Ordonez's pension

plan was approximately 2%, according to MacNab. (MacNab Tr. 4/16/02 at 149–50; Pls.' Ex. 106.) MacNab calculated the losses that each pension plan incurred as a result of carrying excessive life insurance policies by determining what the plans would have earned if that amount were placed in appropriate levels of term life insurance with the difference invested in "normal investments" with a 10% rate of return.[9] (MacNab Tr. 4/16/02 at 153–55; MacNab Tr. 4/26/02 at 678–82; Pls.' Ex. 106.) According to MacNab, Dr. Meyer's plan lost an estimated $102,924 (from 1983 to 1996) and Dr. Ordonez's plan lost an estimated $141,823 (from 1983 to 1996). (Pls.' Ex. 106.)

Aside from the life insurance components, the evidence established that the doctors' contributions were invested very conservatively, notwithstanding the fact that no Berkshire representative conducted any analysis of the participants' tolerance for risk. (Ordonez Tr. 3/21/02 at 323–34.) Stephen O'Malley, manager of pension administration for Berkshire, gathered as many pertinent documents as he could, and provided the materials to an employee in Berkshire's actuarial department. (O'Malley Tr. 3/22/02 at 537–38.) Together, they identified the 1983 beginning balances of each pension plan ($279,-760 for Dr. Meyer's plan and $278,843 for Dr. Ordonez's plan) and the 1996 final balances ($1,094,459 for Dr. Meyer's plan and $912,223.32 for Dr. Ordonez's plan).

---

**8.** At trial, Berkshire's counsel moved to strike Dodge's testimony that the overall rate of return on the insurance policies was less than 1%, on the grounds that it was an opinion that had not been previously expressed by Dodge. (Tr. 3/21/02 386–87.) The court agrees with plaintiffs' counsel that Dodge's opinion as to the insurance policies' rate of return and the policies' overall effect on the plans was elicited at his deposition; hence, the defendant's motion is overruled. In any

event, the court relies on MacNab's calculations that the plans' insurance policies had rates of return ranging from 1% to 2%, even without Dodge's concurring opinion. (Pls.' Ex. 106.)

**9.** MacNab used figures released by Berkshire on an annual basis to determine the costs of the hypothetical term life insurance policies. (MacNab Tr. 4/26/02 at 678.)

(O'Malley Tr. 3/22/02 at 537–38; Def.'s Ex. 120, 121.)[10] They attempted to account for every transaction from 1983 to 1996 (Def.'s Ex. 120, 121), although O'Malley testified that it was a "pretty grueling task quite honestly. In the earlier years and as the transactions got more, there were more assets to look through, the availability of the statements became questionable. Some statements weren't there at all and as a result, I had to put not available in some of these entries." (O'Malley Tr. 3/22/02 at 540, 547–49.) By referencing the beginning and final balances, O'Malley and his assistant concluded that each plan had an internal rate of return of approximately 6.16%. (O'Malley Tr. 3/22/02 at 539; Def.'s Ex. 120, 121.) Importantly, however, O'Malley admitted on cross-examination that the 6.16% figure does not include the plans' life insurance components. (O'Malley Tr. 3/22/02 at 550–51.)

MacNab was the only witness who calculated the plans' actual rates of return including (and excluding) their life insurance components.[11] Excluding life insurance, MacNab's figures are quite similar to O'Malley's: MacNab estimates that the plans' overall rate of return from 1983 to 1996, excluding life insurance, was between 5.5% and 6.1%. (MacNab Tr. 4/16/02 at 143.) She computed that the plans' rates of return, however, were much lower including the life insurance. Dr. Meyer's plan had a 3.71% rate of return from 1983 to 1996 and Dr. Ordonez's plan had a 2.85% rate of return from 1983 to 1996, including life insurance.[12] (MacNab Tr. 4/16/02 at 140–41; Pls.' Ex. 106.)

The experts disagreed as to what constitutes a reasonable rate of return for pension plans for the relevant time period. MacNab testified that a moderate risk portfolio had an expected rate of return of approximately 9% (although she could not say over what specific time period) and an actual rate of return of approximately 10% to 12% from 1993 to 1997. (MacNab Tr. 4/16/02 at 135, 138–39; MacNab Tr. 4/26/02 at 661–62; Pls.' Ex. 106; Pls.' Post–Trial Br. at 13.) She concluded, therefore, that the plans' actual rates of return (whether or not one considers insurance) were "unacceptably low." (Pls.' Ex. 106; *see also* Dodge Tr. 3/21/02 at 422–23.) Logan, on the other hand, estimated that between 5% and 7% is a "reasonable and expected return for pension plans" over time.[13] (Logan Tr. 3/22/02 at 589–90; Logan Tr. 4/16/02 at 72–73.) Logan, then, would consider the plans' actual rates of return *excluding* insurance (approximately 6%) to be reasonable; presumably, however, he would not consider their actual rates of return *including* insurance (2.85% to 3.71%) to be reasonable. In addition, Logan conceded on cross-examination that internal Berkshire documents listed projected rates of return for the plans ranging from 8% to 12%. (Logan Tr. 3/22/02 at 640–42; Logan Tr. 4/16/02 at 4–7; Pls.' Ex. 99; Def.'s Ex. 4, 5, 6, 7.) Given Berkshire's own figures, the plaintiffs' experts' testimony, and the evidence summarized below

---

**10.** MacNab identified some errors in O'Malley's calculations and, hence, her damages calculations reflect the plans' actual values as corrected. (Pls.' Post–Trial Br. at 13–14.)

**11.** MacNab testified that she used Berkshire's own documents in rendering her calculations. (MacNab Tr. 4/16/02 at 140–41.)

**12.** Dodge estimated that the plans had overall rates of return ranging from 3% to 5%, but he did not state how he derived those figures. (Dodge Tr. 3/21/02 at 422–23.) In addition, as stated, Logan did not calculate actual rates of return himself, but rather relied on figures presented to him. (Logan Tr. 4/16/02 at 16.)

**13.** As revealed in cross-examination, however, Logan originally opined that between 6% and 7% was a reasonable rate of return. (Logan Tr. 3/22/02 at 638.)

regarding the plans' lack of diversification and concentration in low-yield investments, the court agrees with the plaintiffs that a 6% rate of return (and certainly a 2% or 3% rate of return) for these plans was unacceptably low.

On the second issue, failure to diversify, the evidence unequivocally established that the plans were not diversified. In fact, even Meszaros and Logan conceded that the plans did not conform to the "Modern Portfolio Theory" or reflect an effort to maintain a diversified portfolio.[14] (Meszaros Tr. 3/20/02 at 136–37; Logan Tr. 4/16/02 at 24; see also Dodge Tr. 3/21/02 at 413; MacNab Tr. 4/16/02 at 156.) As stated, O'Malley and his assistant tallied, to the extent possible given missing documents, every transaction that occurred from 1983 to 1996 in each plan. (Def.'s Ex. 120, 121.) MacNab, using O'Malley's list, classified each investment as either an "equity" or "income" investment.[15] (MacNab Tr. 4/16/02 at 155–57; Pls.' Ex. 107, 108.) MacNab's classification reveals that in twelve of the fourteen years at issue, 90% or more of the plans' assets were invested in conservative income products.[16] (Pls.' Ex. 107, 108.) For purposes of comparison, Logan, the defendant's expert witness, characterized a portfolio that contained 80% income prod-

ucts and 20% equity investments as "conservative." [17] (Logan Tr. 4/16/02 at 14–16.) Accordingly, Logan admitted that MacNab's classification reveals that the plans were invested at times even more conservatively than his most conservative category. (Logan Tr. 4/16/02 at 17–20.)

In addition, the evidence established that the contributions (again, aside from the payment of life insurance premiums) were invested overwhelmingly in annuities. Dodge testified that, according to Berkshire's own documents, nearly 80% of the plans' funds were invested in annuities at one point. (Dodge Tr. 3/21/02 at 413; Def.'s Ex. 99 at Tab L; Def.'s Ex. 100 at Tab L.) For instance, in 1994, of the approximately $1 million invested in Dr. Meyer's plan, approximately $842,000 was invested in annuities. (Def.'s Ex. 99 at Tab L.) Similarly, in 1994, of the approximately $838,000 invested in Dr. Ordonez's plan, approximately $770,000 was invested in annuities. (Def.'s Ex. 100 at Tab L.)

Although annuities are prudent investments as a general proposition (Logan Tr. 3/22/02 at 580–81), placing approximately 80% of the plans' funds in annuities violates the principle of diversification. (Dodge Tr. 3/21/02 at 401–03, 413; see also Logan Tr. 4/16/02 at 24 (referring to Modern Portfolio Theory).) Further, Dodge

---

**14.** Meszaros testified that he never developed an investment objective pertaining to a certain asset mix (e.g., 50% equity and 50% income), nor did he communicate with the doctors whether a particular asset mix would be desirable. (Meszaros Tr. 3/20/02 at 136–37.) Rather, Meszaros's credo was that he "would rather have a return *of* your money than a return *on* your money." (Meszaros Tr. 3/20/02 at 139) (emphasis added).

**15.** The experts generally used the term "equity" to refer to stocks, and "income" to refer to bonds.

**16.** The least conservative investment mix is seen in Dr. Meyer's plan in 1987, when 60%

of the plans' assets were invested in income products and 40% were invested in equity products. (Pls.' Ex. 107, 108.)

**17.** A summary of Logan's characterizations is as follows. As stated, approximately 80% income and 20% equity investments is "conservative;" approximately 60% income and 40% equity investments is "moderately conservative;" 50% income and 50% equity investments is "moderate;" approximately 30% income and 70% equity investments is "moderately aggressive;" and, approximately 10% income and 90% equity investments is "aggressive." (Logan Tr. 4/16/02 at 14–16.)

and MacNab explained that fixed and variable annuities are considered expensive investments because they charge numerous fees. (Dodge Tr. 3/21/02 at 402–07; MacNab Tr. 4/16/02 at 157–59.) Annuities are tax-deferred investments and, hence, the fees are often offset by their tax advantages. (Dodge Tr. 3/21/02 at 407; MacNab Tr. 4/16/02 at 157–59.) The plaintiffs' experts testified (and Logan agreed), however, that the plans did not reap this tax advantage because there is no added benefit to placing tax-deferred investments (i.e., annuities) inside tax-deferred pension plans. (Dodge Tr. 3/21/02 at 408–09, 412; MacNab Tr. 4/16/02 at 157–59; Logan Tr. 4/16/02 at 35.)

On the third issue, churning, the plaintiffs' experts opined that Meszaros acted imprudently by rapidly churning the plans' assets to generate commissions for himself, in addition to investing in excess life insurance policies and low-yielding annuities. Significantly, the defendant's expert, Logan, offered no opinion on churning. (Logan Tr. 3/22/02 at 621 ("I'm offering no opinion on [churning]"); Logan Tr. 3/22/02 at 616–17 (testifying that he did not review the transactions "by product," but only the "by-year" transactions); Logan Tr. 4/16/02 at 52 (stating that he did not attempt to "total up" the surrender charges incurred by the plans).)

Meszaros himself testified about a series of transactions whereby he rapidly moved the funds in Dr. Meyer's plan from one investment product to another. (Meszaros Tr. 3/20/02 at 144–79; Pls.' Ex. 3; *see also* Logan Tr. 4/16/02 at 48–50 (detailing similar transactions in Dr. Ordonez's plan).) In 1983, Dr. Meyer's pension plan funds were invested in a Berkshire annuity. (Meszaros Tr. 3/20/02 at 144–45.) On April 29, 1987, Meszaros executed a total surrender and withdrew all $352,619.30, and moved some of the funds into various accounts with Keystone Custodian Funds, Inc. (Meszaros Tr. 3/20/02 at 145; Pls.' Ex. 3 at 23–24.) Just over one year later, on July 13, 1988, Meszaros withdrew more than $220,000 from the Keystone accounts and moved the funds into various accounts with MFS Investment Management. (Meszaros Tr. 3/20/02 at 145–52; Pls.' Ex. 3 at 38, 43–45.) On January 4, 1990, Meszaros withdrew more than $200,000 from the MFS investments and used the funds to invest in a Berkshire Flexible Premium Annuity on January 10, 1990. (Meszaros Tr. 3/20/02 at 152–156; Pls.' Ex. 3 at 65–69.) In August 1990, Meszaros again moved some funds from the MFS investments and placed them into the Berkshire Flexible Premium Annuity. (Meszaros Tr. 3/20/02 at 156; Pls.' Ex. 3 at 71–83.) On December 26, 1990, Meszaros put an additional $25,000 into the Berkshire Flexible Premium Annuity. (Meszaros Tr. 3/20/02 at 164; Pls.' Ex. 3 at 82.) Then, just days later (on January 8, 1991), Meszaros withdrew more than $56,000 from the Berkshire Flexible Premium Annuity. (Meszaros Tr. 3/20/02 at 165; Pls.' Ex. 3.) In March 1991, Meszaros withdrew nearly $10,000 from the MFS investments, and in April 1991, he contributed approximately $30,000 to an annuity with John Alden Life Insurance Company. (Meszaros Tr. 3/20/02 at 165; Pls.' Ex. 3.)

Also in 1991, Meszaros withdrew approximately $80,000 from the Berkshire Flexible Premium Annuity. (Meszaros Tr. 3/20/02 at 166; Pls.' Ex. 3.) This transaction alone incurred a surrender charge of $4,313.41. (Meszaros Tr. 3/20/02 at 166; Pls.' Ex. 3.) On August 2, 1991, Meszaros contributed exactly $80,000 to the annuity with John Alden Life Insurance Company. (Meszaros Tr. 3/20/02 at 166; Pls.' Ex. 3.) In January 1992, Meszaros withdrew an additional $49,245.46 from the Berkshire Flexible Premium Annuity, and on January 6, 1992, a contribu-

tion in the amount of $49,245.09 was made to the John Alden Life Insurance Company annuity. (Meszaros Tr. 3/20/02 at 170–71; Pls.' Ex. 3.) Later that year, on October 28, 1992, Meszaros withdrew $17,505.50 from the John Alden Life Insurance Company annuity, and on November 5, 1992, a representative from Sun Life Assurance Company of Canada acknowledged that she received Dr. Meyer's application for an annuity and a check in the amount of $17,505.50. (Meszaros Tr. 3/20/02 at 172–76; Pls.' Ex. 3.)

In July 1993, Meszaros withdrew approximately $200,000 from the Berkshire Flexible Premium Annuity; to effectuate the transaction, Berkshire issued a check for $200,000 payable to Dr. Meyer's annuity with Sun Life Assurance Company of Canada. (Meszaros Tr. 3/20/02 at 177–78; Pls.' Ex. 3.) This transaction alone incurred a charge of $5,726.52. (Meszaros Tr. 3/20/02 at 177–78; Pls.' Ex. 3.) Despite the incurred surrender charge, Meszaros withdrew a total of approximately $136,000 from the annuity with Sun Life Assurance Company of Canada between March and June 1994, less than one year after the $200,000 contribution to the account. (Meszaros Tr. 3/20/02 at 178–80; Pls.' Ex. 3.) Since Meszaros removed the funds within the first year, an additional penalty of approximately $8,000 was assessed.[18] (Meszaros Tr. 3/20/02 at 180; Logan Tr. 4/16/02 at 43–47; Pls.' Ex. 3.) [19]

Although questioned repeatedly, Meszaros was unable to recall why he executed these various transactions, although he stated that the investments he purchased must have had better rates of return. (Meszaros Tr. 3/20/02 at 144–79.) Meszaros was aware, however, that surrender fees and deferred sales charges are imposed on rapid sales of annuities and other investment products. (Meszaros Tr. 3/20/02 at 162, 166.) Meszaros testified, both at deposition and at trial, that, as a general philosophy, he was comfortable transferring funds from one investment to another, so long as the second investment had a higher rate of return, because any surrender penalty or deferred sales charge incurred would be absorbed "over the long term." (Meszaros Tr. 3/20/02 at 167–70.) For example, in response to the question, "So if you were in an annuity paying 5% and you took money out and you had to pay 3% deferred sales charge or surrender penalty, you would still be willing to move to the new annuity as long as it were paying 6%," Meszaros answered, "Yes." (Meszaros Tr. 3/20/02 at 169–70.)

Dodge and MacNab testified that Meszaros's pattern of rapidly transferring funds from one investment to another constitutes churning, which had a negative effect on the plans' performance. (Dodge Tr. 3/21/02 at 398–401) ("There appears to be indiscriminate surrenders of one product to turn around and purchase a product of like kind and then turn around and surrender that and go back and purchase the same product that they just surrendered over and over and over again."); *see also*

---

**18.** Although Logan offered no opinion on churning, when questioned specifically about Meszaros's withdrawal of funds from the Sun Life annuity less than one year after placing them there, he acknowledged that Dr. Meyer's pension plan received no benefit from these transactions. (Logan Tr. 4/16/02 at 47.)

**19.** The aforementioned transactions are merely a sampling of such transfers consummated by Meszaros. The evidence established that Meszaros continued to rapidly shift the plans' assets throughout his relationship with the plaintiffs. (*See* Pls.' Ex. 3 (detailing the transactions for Dr. Meyer's plan from 1983 to 1996); Pls.' Ex. 4 (similarly outlining the transactions for Dr. Ordonez's plan from 1983 to 1996; *see also* Logan Tr. 4/16/02 at 48–52 (discussing transactions for Dr. Ordonez's plan in 1993 and 1994).)

Pls.' Ex. 106 ("Monies were transferred from one fixed annuity to another in one year, transferred back the following, and then transferred back again two month [sic] after that ... Transferring assets back and forth between substantially similar programs triggers longer and higher surrender charges without apparently adding value to the overall program."). In fact, Dodge and MacNab opined that the only value created from this pattern of transactions was the commissions to Meszaros. (Dodge Tr. 3/21/02 at 399–401) ("They were turning around and purchasing the same type of product only from a different company with the only apparent value that was occurring was commissions being generated. No apparent value was being created for the customer... Generally, I would say why didn't you stay within the family of funds, the same family of funds ... Why move to a separate family and trigger a commission and trigger a charge?"); *see also* Pls.' Ex. 106 ("Sometimes these transfers incurred immediate surrender charges, and with each transfer, additional future surrender charges were imposed on the new annuity contracts ... it does not appear that the costs and charges that were imposed to pay commissions ... were adequately disclosed ...").

Meszaros was, in fact, paid by commissions. (Logan Tr. 4/16/02 at 59.) Meszaros acknowledged that he received a commission each time he purchased an investment on behalf of the doctors' pension plans. (Meszaros Tr. 3/20/02 at 147–48.) Meszaros also explained that he had broker relationships with other insurance companies, including those mentioned above, which enabled him to sell their products to his Berkshire clients. (Meszaros Tr. 3/20/02 at 194–97; *see also* Logan Tr. 3/22/02 at 600 (explaining that Meszaros had direct agency relationships with other companies).) Meszaros testified that he earned commissions for purchasing investment products from these other companies. (Meszaros Tr. 3/20/02 at 147–48.) Meszaros also received commissions on the life insurance policies in the pension plans. (Meszaros Tr. 3/20/02 at 232.)

The court agrees with Dodge and MacNab that Meszaros's pattern of rapidly transferring the plans' assets constitutes churning. Even Meszaros could not make sense of his transactions. Considering also Logan's refusal to offer an opinion on churning, the court accepts the plaintiffs' rationale that the only value created from the indiscriminate and illogical transfers of plan assets was the commissions paid to Meszaros.

Meanwhile, the plaintiffs only became suspicious of Meszaros's investment practices when Theresa Jones, Dr. Ordonez's secretary, attempted to borrow money from the pension plan in connection with the purchase of a condominium in 1996. (Jones Tr. 3/21/02 at 290; *see also* Def.'s Ex. 18.) In approximately June 1996, Jones telephoned Berkshire looking for Meszaros; she was told he was not available. (Jones Tr. 3/21/02 at 290–91.) After some time, Jones discovered that Meszaros was no longer employed at Berkshire. (Jones Tr. 3/21/02 at 292–93.) Jones also learned at that time that Berkshire would no longer service the pension plans and that tax returns had not been filed for the plans. (Jones Tr. 3/21/02 at 292–93; Pls.' Ex. 52, 53.) Jones communicated her concerns to Dr. Ordonez, which ultimately resulted in this litigation. (Ordonez Tr. 3/21/02 at 339.)

### I. *Fiduciary status*

 The plaintiffs allege that Berkshire

violated 29 U.S.C. § 1104(a).[20] There is no dispute that the doctors' plans were ERISA-qualified plans or that the plaintiffs were beneficiaries of the plans under 29 U.S.C. § 1002. The parties contest, however, whether Berkshire was an ERISA fiduciary. *See* 29 U.S.C. § 1002(21)(A) (2003); *see also* 29 U.S.C. § 1002(9) (2003) (including "corporation" within the definition of "person").

The court first finds that Berkshire has conceded that it was an ERISA fiduciary. The amended complaint stated four common law causes of action and, in the alternative, a cause of action under ERISA. (*See* Am. Compl.) (alleging professional negligence, negligent misrepresentation or omission, deceit, breach of common law fiduciary duty, and breach of fiduciary duty pursuant to ERISA). Importantly, the facts as alleged in the amended complaint are substantially similar to the court's findings of fact, namely, that Meszaros, as an agent of Berkshire, mismanaged the doctors' pension plans from 1983 to approximately 1996 or 1997. (*See* Am. Compl.)

In its motion for summary judgment, Berkshire argued that ERISA preempted the common law claims, but that it was not an ERISA fiduciary. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. against Paul D. Meyer, M.D., Trustee.) The plaintiffs argued in their opposition memorandum that the defendant's position was internally inconsistent because "if Berkshire is not an ERISA fiduciary, then, as a matter of law, ERISA does not preempt the state law claims against Berkshire." (Pls.' Mem. in Opp. to Mot. for Summ. J. at 16.) The plaintiffs also argued in their opposition memorandum that Berkshire was an ERISA fiduciary because Meszaros exercised discretionary authority and control over the plans' assets, and because Meszaros rendered investment advice for a fee, pursuant to 29 U.S.C. §§ 1002(21)(A)(i) and (ii). (Pls.' Mem. in Opp. to Mot. for Summ. J. at 22–27.)

In its reply memorandum, Berkshire stated the following:

### MODIFICATION OF ORIGINAL MEMORANDUM

Given Plaintiffs' concession that their common law claims are pre-empted if "Berkshire served as an ERISA fiduciary," Defendant will waive its argument that it was not an ERISA fiduciary. Thus, this case should proceed as an ERISA case, subject to ERISA statutes and case law interpreting it.

(Def.'s Reply Mem. at 2) (citation omitted).[21]

Upon making this concession, the defendant argued for twenty pages that the statute of limitations bars the action. (Def.'s Reply Mem. at 3–23.) Notably, the defendant did not respond whatsoever to the plaintiffs' contentions that Berkshire was an ERISA fiduciary because Meszaros exercised discretionary authority over the plans' assets and rendered investment advice for a fee, pursuant to 29 U.S.C. §§ 1002(21)(A)(i) and (ii). (*See* Def.'s Reply Mem.)

Accordingly, in its memorandum and order, the court reiterated the plaintiffs' contention that Berkshire advanced internally inconsistent arguments and then stated:

20. The plaintiffs also alleged a violation of 29 U.S.C. § 1106, but the court dismissed this claim at trial. (Tr. 4/26/02 at 701–02.)

21. Defendant's post-trial memorandum, purporting to reiterate "Berkshire's precise position on its fiduciary status," did not include the first half of the phrase, which sets the context for the concession contained in the reply memorandum. (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 3.)

"In its reply to the Doctors' opposition, Berkshire rendered evaluation of that issue unnecessary by conceding that it was an ERISA fiduciary." *Meyer v. Berkshire Life Ins. Co.*, 128 F.Supp.2d 831, 835 (D.Md.2001). In light of Berkshire's concession, the court granted the defendant's motion for summary judgment as to the four common law claims on the basis that they were preempted by ERISA. *Id.* Significantly, the court did not regard Berkshire's concession as an arguendo or hypothetical concession, nor did it attach any qualifications or limitations to it. *Id.* Rather, the court treated the concession as Berkshire itself intended it to be treated: as a means to broadly preempt the four common law claims that alleged that Berkshire, via its agent, Meszaros, mismanaged the doctors' pension plans. *Id.* The court then rejected Berkshire's statute of limitations arguments and the case proceeded to trial. *Id.* at 835–40.

At trial, and in its post-trial memorandum, Berkshire, represented by new counsel, disavowed its earlier concession by attempting to recast its scope and the context in which it was made. (*See, e.g.,* Def. Berkshire Life Insurance Company's Post–Trial Mem. at 3–4, 6–8.) To wit, Berkshire suggested that the court "analyzed the ERISA preemption issues separate and apart from Berkshire's concession" in its summary judgment memorandum and order. (*Id.* at 3–4.) This assertion is plainly belied by the court's memorandum. 128 F.Supp.2d at 835. The court relied on Berkshire's concession of fiduciary status and added that the suit relates to an employee benefit

plan; accordingly, ERISA preempted the common law claims. *Id.* at 835. In addition, Berkshire argued throughout trial and in its post-trial memorandum that it could not be held vicariously liable for the actions of its agent (*see, e.g.,* Def. Berkshire Life Insurance Company's Post–Trial Mem. at 6–10), despite the fact that Berkshire conceded it was an ERISA fiduciary in order to preempt common law causes of action against it based on the conduct of Meszaros.

The Fourth Circuit has held that representations made during the course of litigation are binding. *See, e.g., Hagan v. McNallen (In re: McNallen)*, 62 F.3d 619, 625 (4th Cir.1995); *see also Major v. CSX Transp., Inc.*, 170 F.Supp.2d 563, 567 (D.Md.2001). In addition, while the Fourth Circuit has not specifically addressed concessions of fiduciary status in ERISA cases, those courts that have confronted the issue have held that such concessions are binding. *See, e.g., Moench v. Robertson*, 62 F.3d 553, 560–62 (3d Cir. 1995); *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 367 (2d Cir.1994); *Pedre Co., Inc. v. Robins*, 901 F.Supp. 660, 665–66, n. 6 (S.D.N.Y. 1995); *cf. Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F.Supp. 278, 286–89, n. 5 (D.N.J.1994) (holding that an arguendo concession of ERISA fiduciary status at the summary judgment phase would be unhelpful since resolution of that point "will control the entire case"); [22] *see also Pegram v. Herdrich*, 530 U.S. 211, 228 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

**22.** Unlike Berkshire, the defendants in *Schiffli* wanted to concede *for the purposes of the summary judgment motion only* that they were ERISA fiduciaries. 869 F.Supp. at 287, n. 5. The court rejected that strategy because it would permit the defendants to argue at trial that they were not ERISA fiduciaries, "the

state law claims having already been struck." *Id.* at 288. "It would not be reasonable or fair," said the court, if "these defendants could walk away from the case without ever having addressed the substance of the allegations against them." *Id.*

The opinion in *Moench* is particularly instructive. The plaintiff in that case filed a motion for partial summary judgment seeking a declaration that the defendants were ERISA fiduciaries with regard to particular investment decisions. 62 F.3d at 560–61. In their cross-motion for summary judgment, the defendants conceded that they were ERISA fiduciaries, but argued that they did not breach any of their fiduciary duties. *Id.* The district court granted both motions, and on appeal, the defendants attempted to recast the scope of their earlier concession. *Id.* at 560–62. The Third Circuit offered the following explanation regarding the scope to afford the defendants' concession:

> Based on this representation, the district court quite naturally interpreted the [defendants'] admission consistently with the relief [plaintiff] sought in his motion. In that motion, [plaintiff] sought a partial summary judgment declaring that the [defendants] were fiduciaries *vis a vis*, among other things, investment decisions ... Thus, in the absence of any distinctions or qualifications drawn by the [defendants] with respect to the capacities in which [they] were fiduciaries, the court granted [plaintiff's] motion and treated the [defendants] as fiduciaries *vis a vis* investment decisions... Thus, the [defendants are] changing course when [they] now argue[ ] ... that [they were] simply not

an ERISA fiduciary in the relevant capacity. We will not permit this. *Id.* at 561–62.

As explained, Berkshire's unqualified concession that it was an ERISA fiduciary was in response to the plaintiffs' claims that Berkshire, through its agent, violated numerous common laws by mismanaging their pension plans. The court accepted the defendant's concession, and Berkshire's subsequent attempts to disavow the concession it made or to constrict its scope are unavailing. The court finds, therefore, that Berkshire was an ERISA fiduciary with regard to the conduct alleged in the amended complaint, namely Meszaros's investment decisions on behalf of the plans from 1983 to sometime in 1997.

■ Even setting aside its concession, the court holds that Berkshire was an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(ii), which defines a fiduciary as one who "renders investment advice for a fee." Importantly, Berkshire conceded, this time at trial, that it was an ERISA fiduciary pursuant to this section by virtue of the commissions Meszaros received in connection with transactions made on behalf of the doctors' plans. (Tr. 3/20/02 at 34–35.) [23] Berkshire asserted in its posttrial memorandum, however, that it should be considered an ERISA fiduciary only to the extent that Meszaros "acted within his scope of authority as a Berkshire insurance agent and for the benefit of Berkshire." [24] (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 7.)

---

**23.** The following is an excerpt from the dialogue between the court and the defendant's counsel during opening statements:

> THE COURT: You seem to be agreeing that if a commission is being paid to a Berkshire agent that is advice for a fee and that is a fiduciary function?
> MR. CHRISTAKOS: For purposes of this case, I believe that's the logical consequence of the position that was taken earlier ...

(Tr. 3/20/02 at 34–35.)

**24.** The court will first consider Berkshire's status as an ERISA fiduciary generally pursuant to 29 U.S.C. §§ 1002(21)(A)(i)-(ii). Then, the opinion will address whether Berkshire acted as an ERISA fiduciary with regard to the specific conduct alleged in the amended complaint. Berkshire's vicarious liability arguments will be analyzed at the end of this section.

Apart even from Berkshire's second concession, the court finds that Berkshire was an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(ii). In *Brink v. DaLesio*, 496 F.Supp. 1350, 1374–76 (D.Md.1980), *aff'd in part, rev'd in part on other grounds*, 667 F.2d 420 (4th Cir.1981), the court held that the defendant, who performed consulting, administrative, and insurance brokerage services for pension funds, was an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(ii) because "Congress took a functional approach towards defining who would be treated as a fiduciary." *See also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Custer v. Sweeney*, 89 F.3d 1156, 1161–62 (4th Cir.1996). The court rejected the defendant's attempt to portray his role as "purely ministerial," and noted instead that the defendant made the initial decisions and the trustees "relied heavily on [his] advice in a number of respects." *Brink*, 496 F.Supp. at 1374–76. Given Congress' functional approach, as reflected in ERISA's legislative history, the court held that the defendant in that case was an ERISA fiduciary with respect to the claims alleged against it. *Id.*

In addition, the Department of Labor issued regulations that explain the meaning of "investment advice for a fee" in 29 U.S.C. § 1002(21)(A)(ii), as stated below.

A person shall be deemed to be rendering 'investment advice' ... only if [s]uch person ... makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and [s]uch person ... [r]enders any advice ... on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan ... that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3–21(c)(1) (2003); *see also Thomas, Head & Greisen Employees Trust v. Buster*, 24 F.3d 1114, 1116–20 (9th Cir.1994).

Berkshire, through Meszaros, made countless recommendations to the plans regarding the advisability of various investments and insurance policies, on which the trustees heavily relied. Such advice was made on a regular basis from 1983 to sometime in 1997. Berkshire rendered advice to the plans pursuant to mutual agreements between it and the trustees that Berkshire would serve as the primary source of investment decisions with regard to plan assets. Berkshire purported to render individualized investment advice to the plans that would result in sound portfolios. Finally, Berkshire was compensated for its services by way of required life insurance policies and various fees and commissions incurred by the plans. Accordingly, pursuant to Congress' functional definition of a fiduciary and the relevant case law and regulations, the court holds that Berkshire was an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(ii).[25]

---

**25.** In addition, Berkshire very well may have been an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i). The defendant never responded substantively to the plaintiffs' contention that Berkshire exercised discretionary authority and control over the plans' assets.

(*See, e.g.,* Def.'s Mem. in Supp. of Mot. for Summ. J. against Paul D. Meyer, M.D., Trustee at n. 8; Def.'s Reply Mem. at 3; Def. Berkshire Life Insurance Company's Post–Trial Mem. at 6–7.) In *Custer v. Sweeney*, 89 F.3d 1156, 1161–63 (4th Cir.1996), the Fourth Cir-

Of course, "'[f]iduciary status under ERISA is not an all-or-nothing concept.'" *Darcangelo v. Verizon Communications Inc.*, 292 F.3d 181, 192 (4th Cir. 2002) (quoting *Custer*, 89 F.3d at 1162) (quotations and citation omitted). Since the "same entity may function as an ERISA fiduciary in some contexts but not in others," *Darcangelo*, 292 F.3d at 192, "'[i]n every case charging breach of ERISA fiduciary duty ... the threshold question is ... whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'" *Id.* at 192–93 (quoting *Pegram*, 530 U.S. at 225–26, 120 S.Ct. 2143). In particular, courts should consider "whether the acts in question were like traditional fiduciary decisions, which are typically 'decisions about managing assets and distributing property to beneficiaries.'" *Darcangelo*, 292 F.3d at 193 (quoting *Pegram*, 530 U.S. at 231, 120 S.Ct. 2143); *see also Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61–62 (4th Cir.1992).

The plaintiff in *Darcangelo* alleged that the administrator of a disability benefits plan "solicited and disseminated [her] private medical information in order to assist [her employer] in its efforts to declare [her] a 'direct threat' to her coworkers so that she could be fired." 292 F.3d at 185. The Fourth Circuit found that the complaint set forth claims that were "entirely unrelated to [the administrator's] duties under the ERISA plan." *Id.; see also id.* at 189, 192–94 ("Darcangelo's complaint cannot be read to say that [the administrator] obtained her medical information in the course of processing a benefits claim or performing any of its other administrative duties under the ERISA plan"). In this case, however, as stated in the court's summary judgment memorandum and order: "At heart, the Doctors allege mismanagement of their pension fund." 128 F.Supp.2d at 835; *see also* Am. Compl. at ¶¶ 74–78. The plaintiffs charge, in sum, that Berkshire placed excessive pension plan funds into life insurance policies, imprudently invested funds in low-yielding annuities, and repeatedly churned the

---

cuit explained that while "any individual who *de facto* performs specified discretionary functions with respect to the management, assets, or administration of a plan" is an ERISA fiduciary, in that case, the defendant only made non-binding recommendations and performed ministerial functions; hence, the defendant was not an ERISA fiduciary. *Cf. Reich v. Lancaster*, 55 F.3d 1034, 1047–50 (5th Cir.1995) (holding that because the trustees were inexperienced in financial matters and accepted all of the defendant's recommendations, the defendant "usurped the Trustee's independent discretion and effectively exercised authority and control" over the plan, rendering it an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(i)); *Stanton v. Shearson Lehman/American Express, Inc.*, 631 F.Supp. 100, 102–04 (N.D.Ga.1986) (finding that when a trustee merely "rubber stamps" the defendant's investment recommendations, the defendant is effectively in control of the plan assets and, hence, an ERISA fiduciary). Berkshire argued in its post-trial memoran-

dum that in the absence of a writing delegating investment manager status upon Berkshire, it could not be considered a fiduciary. (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 6–7.) The aforementioned cases dealing with de facto authority and control over plan assets, however, do not consider whether there was a writing conferring investment manager status upon the defendant. *See also Procacci v. Drexel Burnham Lambert, Inc.*, No. 89–0555, 1989 WL 121984, at *4–5 (E.D.Pa. Oct.16, 1989) (explaining that the "purpose of [29 U.S.C. § ] 1002(38), which permits delegation of trustee authority to investment managers, is to allow the named trustees to insulate themselves from ERISA liability for the acts of the investment manager, not to protect fiduciaries from liability for their own misconduct"). From a functional perspective, Berkshire quite likely exercised the requisite discretionary authority and control over the plans' assets to be considered a fiduciary under 29 U.S.C. § 1002(21)(A)(i).

plans' assets. Unlike *Darcangelo*, all of the conduct alleged in the amended complaint relates to "traditional fiduciary function[s]," such as managing the doctors' pension plan assets. 292 F.3d at 193. The court concludes, therefore, that Berkshire was acting as an ERISA fiduciary when taking the actions that are the subject of the doctors' complaint. *See Pegram*, 530 U.S. at 225–26, 120 S.Ct. 2143.

■ Finally, Berkshire suggested that it should be considered an ERISA fiduciary only to the extent that Meszaros "acted within his scope of authority as a Berkshire insurance agent and for the benefit of Berkshire." (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 6–8.) Berkshire relies on two cases from other circuits to support its vicarious liability theory.[26] (*See* Def. Berkshire Life Insurance Company's Post–Trial Mem. at 7–8) (citing *Hamilton v. Carell*, 243 F.3d 992 (6th Cir.2001); *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y*, 841 F.2d 658 (5th Cir.1988)).

■ These cases make clear that the doctrine of vicarious liability may serve to impose ERISA liability on a *non-fiduciary* principal by virtue of the breaches of its *fiduciary* agent. *See, e.g., Hamilton*, 243 F.3d at 1001 (explaining that, "Plaintiffs do not allege that DHM is directly liable as a corporate fiduciary that breached its duties. Rather, they allege that DHM is derivatively liable under the doctrine of respondeat superior simply by virtue of its agency relationship with Beard"). The plaintiffs in this case alleged, however, that

Berkshire was directly liable as an ERISA fiduciary (*see* Am. Compl. at ¶¶ 75–78), and as discussed above, given its concessions and an analysis of its functions, the court finds that Berkshire itself was an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(ii).

In addition, Berkshire would be derivatively liable under a vicarious liability theory if the Fourth Circuit were to adopt one of the various tests advanced in the aforementioned cases.[27] The Sixth Circuit test, albeit announced as dictum in *Hamilton*, imposes ERISA liability on a non-fiduciary principal when the fiduciary agent breaches a duty "while acting in the course and scope of employment." 243 F.3d at 1002–03; *see also Stanton v. Shearson Lehman/American Express, Inc.*, 631 F.Supp. 100, 105 (N.D.Ga.1996). Meszaros himself testified that he was acting within the scope of his employment as a Berkshire agent when he purchased excessive Berkshire life insurance policies and generated various commissions and fees, all to the benefit of Berkshire and himself. (Meszaros Tr. 3/20/02 at 93, 147–48, 232; *see also* Ordonez Tr. 3/21/02 at 337; Dodge Tr. 3/21/02 at 399–401; Pls.' Ex. 106.)

The Fifth Circuit test articulated in *American Federation*, 841 F.2d at 665, which additionally required that the non-fiduciary principal actively and knowingly participate in the agent's breach, has been clarified in *Bannistor v. Ullman*, 287 F.3d 394, 408 (5th Cir.2002), where the court stated that, "In the context of respondeat superior liability, the issue is whether the principal, by virtue of its de facto control over the agent, had control over the dispo-

---

**26.** Berkshire alternately refers to this argument as its respondeat superior theory. (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 6–8.)

**27.** The Fourth Circuit has yet to squarely address the issue of vicarious liability under ERISA. *Cf. Bedrick v. Travelers Ins. Co.*, 93

F.3d 149, 151, 154 (4th Cir.1996) (the Fourth Circuit holding that an insurance company may be held liable for a breach of fiduciary duty under 29 U.S.C. § 1104 based on the conduct of its employee, without any discussion of vicarious liability).

sition of plan assets." *See also id.* at 412 (Garza, J., concurring) (explaining that, "The issue is only whether the principal, by virtue of its de facto control over the agent, also had control over the disposition of plan assets").[28] Berkshire was Meszaros's employer and had control over Meszaros at all times relevant to this litigation, including the participation of Walsh in the annual meetings with the doctors and Berkshire's dictation of the terms of the plans. The court finds, therefore, that Berkshire, having had de facto control over Meszaros, also had control over the disposition of the plans' assets.[29]

## II. Fiduciary duties

The plaintiffs allege that Berkshire violated 29 U.S.C. § 1104(a), which states in pertinent part:

§ 1104. Fiduciary duties

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a) (2003).

As the title of 29 U.S.C. § 1104(a) suggests, the "prudent man standard of care" applies to actions brought under this section. This is an "objective standard" that requires the fiduciary to "(1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions." *Reich v. King,* 861 F.Supp. 379, 384 (D.Md.1994) (citations omitted). A reviewing court should inquire de novo whether the defendant's conduct meets the standard of care; no deference is afforded to the defendant's conduct in cases involving plan administration or management of plan assets. *See, e.g., Kowalewski v. Detweiler,* 770 F.Supp. 290, 292–94 (D.Md.1991); *see also Reich v. King,* 861 F.Supp. at 383–84.

---

**28.** *See also Hamilton v. Carell,* 243 F.3d 992, 1002–03 (6th Cir.2001) (criticizing the *American Federation* test on the basis that a knowing and active participation requirement converts derivative liability into direct liability).

**29.** In any event, the court again emphasizes Berkshire's original concession of fiduciary status with respect to the guidance offered by the Third Circuit in *Moench.* Since Berkshire's concession was made in response to claims that Berkshire, through its agent, mismanaged the doctors' pension plans, the concession is properly understood to waive any argument that Meszaros was not acting within the scope of his employment when he breached his fiduciary duties.

■ The plaintiffs claim that Berkshire violated numerous fiduciary duties, including the obligations to diversify the plans' assets,[30] to invest the assets prudently, and to act solely in the interests of the beneficiaries. (Am. Compl. at ¶ 76.) Regarding the burdens of proof for these claims,[31] the language of 29 U.S.C. § 1104(a)(1)(C) indicates that there is a burden-shifting analysis with regard to the duty to diversify investments. As stated by the court in *Olsen v. Hegarty,* 180 F.Supp.2d 552, 566–67 (D.N.J.2001), in an action brought by the plan participant, "if the plaintiff meets his initial burden of establishing a failure to diversify, the burden thereupon shifts to the defendant to prove that even though not diversified, the allocation was nonetheless prudent." *See also Reich v. King,* 867 F.Supp. 341, 343 (D.Md.1994) (holding that "the initial burden is on the Secretary to show a violation of the diversification requirement ... [if successful], then Defendants must demonstrate that their actions were 'clearly prudent' " (citations omitted)); *Reich v. King,* 861 F.Supp. at 383 (same). With regard to the other claims, the plaintiffs must prove breach of a fiduciary duty and a prima facie case of loss to the plan. *See, e.g., McDonald v. Provident Indem. Life Ins. Co.,* 60 F.3d 234, 237 (5th Cir.1995).

■ First, the duty to diversify investments " 'cannot be stated as a fixed percentage, because a prudent fiduciary must consider the facts and circumstances of each case.' " *Reich v. King,* 861 F.Supp. at 383 (citations omitted); *see also Olsen,* 180 F.Supp.2d at 567 (citing *In re: Unisys Sav. Plan Litig.,* 74 F.3d 420, 438

(3d Cir.1996)). In this case, the plaintiffs met their initial burden of establishing a failure to diversify the plans' assets. As stated, MacNab determined that in twelve of the fourteen years at issue, 90% or more of the plans' assets were invested in conservative income products. Meszaros and Logan conceded that the plans were not diversified and did not conform to the Modern Portfolio Theory. Berkshire did not meet its " 'heavy burden' of showing that [its] decision not to diversify was clearly prudent." *See Reich v. King,* 861 F.Supp. at 383. The only explanation offered by Berkshire was that the doctors themselves wanted a conservative portfolio. Ordonez's testimony at trial, however, established that the doctors did not articulate an investment strategy. Rather, they deferred entirely to Meszaros's investment decisions, with the expectation that their plans would be worth approximately $2 million each by the time of retirement. Accordingly, considering the facts and circumstances of this particular case, the court holds that Berkshire violated its duty under 29 U.S.C. § 1104(a)(1)(C) to act prudently in diversifying the plans' assets.

■ The plaintiffs also allege that Berkshire failed to invest the plans' assets prudently. In *Reich v. King,* 861 F.Supp. at 383–84, the court explained that while 29 U.S.C. § 1104(a)(1)(C) "requires that a fiduciary be prudent in deciding not to diversify a plan's investments," 29 U.S.C. § 1104(a)(1)(B) mandates that "a fiduciary be prudent in each investment decision." Regulations established by the Department of Labor indicate that the require-

**30.** In its post-trial memorandum, Berkshire asserts that the plaintiffs "drop[ped] the reference" to their claim pertaining to the diversification of plan investments in their pre-trial memorandum. (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 2.) To suggest that the plaintiffs did not pursue a

diversification claim is incorrect. (*See, e.g.,* Pls.' Pre–Trial Bench Mem. at 3–7.)

**31.** Neither the plaintiffs nor the defendant identified the applicable burdens of proof in their post-trial memoranda.

ments of 29 U.S.C. § 1104(a)(1)(B) are satisfied if the fiduciary has given "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment ..." 29 C.F.R. § 2550.404a–1(b)(1)(i) (2003). "Appropriate consideration" includes:

> (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio ... to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and
>
> (ii) Consideration of the following factors as they relate to such portion of the portfolio:
>
> (A) The composition of the portfolio with regard to diversification;
>
> (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
>
> (C) The projected return of the portfolio relative to the funding objectives of the plan.

29 C.F.R. § 2550.404a–1(b)(2) (2003).

 In sum, "A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard." *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 957 (D.C.Cir.1985) (citations omitted); *see also Olsen,* 180 F.Supp.2d at 569.

The plaintiffs have proven that Berkshire did not invest the plans' assets in an objectively prudent manner. The evidence conclusively established that Berkshire and Meszaros did not investigate the merits of particular investment decisions. First, Berkshire required that substantial percentages of the doctors' contributions be placed into life insurance policies, without any investigation whatsoever into the participants' needs for life insurance. Further, Meszaros invested the rest of pension plan funds very conservatively, again without any investigation into the participants' risk tolerance. While Meszaros and Logan admitted that the plans did not conform to Modern Portfolio Theory, they offered no explanation as to why this was so. In fact, even Meszaros could not explain why he chose certain investments and rapidly moved plan assets from one investment to the next. His only apparent philosophy was to transfer assets into like investment products with only slightly higher rates of return (without regard to surrender fees or charges), so that the funds would grow "over the long term." (Meszaros Tr. 3/20/02 at 167–70.) The funds, however, were never kept in any investment for "the long term."

The plaintiffs' experts agreed that Meszaros's pattern of rapidly transferring funds was objectively imprudent and negatively affected the plans. (Dodge Tr. 3/21/02 at 398–401; Pls.' Ex. 106.) Accordingly, the court finds that Meszaros did not "act in a manner as would others who have a capacity and familiarity with such matters." *See Reich v. King,* 861 F.Supp. at 384. Furthermore, the placement of the plans' assets in low-yielding investments and numerous life insurance policies without any independent investigation establishes that Berkshire and Meszaros did not pay "appropriate consideration" to the investments' opportunity for gain or to the plans' projected returns vis-a-vis the doctors' expectations. *See Reich v. King,* 861 F.Supp. at 384; 29 C.F.R. § 2550.404a–1(b)(2) (2003). As such, the court holds that Berkshire violated its fiduciary duty under 29 U.S.C. § 1104(a)(1)(B) to be prudent in each investment decision.

 Finally, the plaintiffs allege that Berkshire violated its fiduciary duty pursuant to 29 U.S.C. § 1104(a)(1)(A) to act "for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan." When fiduciaries have "dual loyalties," they "'are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'" *Bidwell v. Garvey*, 743 F.Supp. 393, 397 (D.Md.1990) (citations omitted); *see also Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir.1996) ("A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants") (citations omitted).

The court finds that both Berkshire and Meszaros were confronted with an inherent conflict of interest. *See, e.g., Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 85–87 (4th Cir.1993); *Bidwell*, 743 F.Supp. at 397–99. They profited by purchasing excessive amounts of Berkshire life insurance policies for the pension plans, generating significant premiums, commissions, and fees from these policies, and receiving commissions from the purchases of other investment products, as well. (*See, e.g.,* Meszaros Tr. 3/20/02 at 99–100, 116–17, 147–48, 232; Dodge Tr. 3/21/02 at 384–85, 399–401; Logan Tr. 4/16/02 at 59; Pls.' Ex. 17, 20, 63, 66, 106.) Yet, the evidence established that these decisions adversely affected the plans and their beneficiaries. (*See, e.g.,* Dodge Tr. 3/21/02 at 382–83, 386–88, 391, 398–401; Logan Tr. 4/16/02 at 50; MacNab Tr. 4/16/02 at 147–55; MacNab Tr. 4/26/02 at 671–82; Pls.' Ex. 17, 106.) Berkshire and Meszaros, therefore, were obliged to act more carefully in view of this conflict. The plaintiffs proved, however, that Berk-shire and Meszaros did not engage in an "'intensive and scrupulous independent investigation to insure that they act[ed] in the best interests of the plan beneficiaries.'" *Bidwell*, 743 F.Supp. at 397 (citations omitted); (*see, e.g.,* Meszaros Tr. 3/20/02 at 116–17, 144–79; Ordonez Tr. 3/21/02 at 316–18, 323–34.) Rather, the evidence revealed that they pursued a course of conduct that profited themselves at the expense of the beneficiaries, while augmenting (not defraying) the costs of servicing the plans. (*See, e.g.,* Meszaros Tr. 3/20/02 at 99–100, 116–17, 147–48, 232; Dodge Tr. 3/21/02 at 384–85, 399–401; Logan Tr. 4/16/02 at 50; Pls.' Ex. 17, 20, 63, 66, 106.) The court, thus, finds that Berkshire did not act in an objectively prudent manner with respect to its conflict of interest and, hence, it violated its fiduciary duty pursuant to 29 U.S.C. § 1104(a)(1)(A).

### III. Defenses

Berkshire asserts two defenses to the breach of fiduciary duty claim: (1) the suit is barred by virtue of the plaintiffs' own breaches as plan trustees; and (2) the statute of limitations and the doctrine of laches bar the action.

 The first argument merits only brief discussion. At the summary judgment phase, Berkshire argued that the suit was barred because the doctors, as trustees and, hence, fiduciaries of the plans, admittedly breached their own fiduciary duties. (*See, e.g.,* Def.'s Mem. in Supp. of Mot. for Summ. J. against Paul D. Meyer, M.D., Trustee at 44–48.) In the court's memorandum, it acknowledged that the doctors may have breached their fiduciary duties, but found that Berkshire had not provided any precedent supporting the proposition that a breach by the suing fiduciaries precludes an ERISA claim

brought on behalf of the plans. 128 F.Supp.2d at 840–41; (see also Order Dismissing Counterclaim, 7/5/01 at 2–4 (holding that Berkshire has no right to indemnification or contribution from the doctors in their capacities as trustees for the plans).) It is unclear from the defendant's posture at trial and its post-trial memorandum whether it has renewed its argument that the suit is barred by the doctors' own breaches. To the extent that the defendant has renewed such an argument, it is rejected for the reasons articulated in the court's previous orders. It appears that the defendant's present arguments pertaining to the doctors' own breaches are phrased in terms of proximate causation (see Def. Berkshire Life Insurance Company's Post–Trial Mem. at 10–11), which will be addressed in the next section.

Berkshire also argues that the ERISA statute of limitations, reprinted below, bars the action.

§ 1113. Limitation of actions

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (2003).

According to Berkshire, the suit was commenced more than three years "after the earliest date on which the plaintiff[s] had actual knowledge of the breach or violation," or alternatively, more than six years after "the date of the last action which constituted a part of the breach or violation." (Def.'s Reply Mem. at 3–4; Def. Berkshire Life Insurance Company's Post–Trial Mem. at 11–13.) [32]

▮▮▮ Regarding the three-year statute of limitations prescribed in 29 U.S.C. § 1113(2), the court reviewed various interpretations of the actual knowledge rule in its summary judgment opinion and concluded that there was an issue of material fact regarding the plaintiffs' knowledge. 128 F.Supp.2d at 840 ("As they are described in the memoranda and exhibits, the reports and annual meetings are an insufficient basis on which to conclude that the Doctors had actual knowledge of an ERISA violation").

This lawsuit was filed on April 27, 1999, and, thus, the relevant inquiry relates to the plaintiffs' actual knowledge as of three years prior to that date, or April 27, 1996. See 128 F.Supp.2d at 837, n. 6. Upon assessing all of the testimony, exhibits, and argument presented at trial and in the post-trial memoranda, the court concludes that the plaintiffs did not have actual knowledge of Berkshire's breaches by

---

**32.** Considering that the doctors relied entirely on Meszaros with no independent scrutiny of the documents provided to them, the court agrees with the defendant that the fraud and concealment exception to the statute of limitations does not apply to this case. See, e.g., J. Geils Band Employee Benefit Plan v. Smith

Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir.1996) (holding that the limitations period is tolled when, inter alia, the plaintiffs exercised " 'reasonable diligence' " in monitoring the fiduciary's conduct) (citations omitted).

April 27, 1996. Numerous factual findings support this conclusion. First, the doctors were not financially astute; the evidence established, in fact, that the doctors retained Berkshire so they would not have to deal with the pension plans themselves. Second, the financial documents shown to the doctors were objectively confusing. (*See, e.g.,* Pls.' Ex. 106 at 13.) Third, the meetings held between the doctors and the Berkshire agents were infrequent and short in duration. The only information presented to the doctors at these brief encounters was the plans' bottom lines; being financially inexperienced, the doctors were satisfied merely seeing the numbers increase, by any degree, from one year to the next. The Berkshire agents did not plainly disclose to the doctors that the plans were incurring sizable surrender fees and commissions. Fourth, while the court acknowledges that the doctors signed off on every transaction, it finds that they merely "rubber stamped" every investment decision made by Meszaros. *See, e.g., Stanton,* 631 F.Supp. at 102–04. The doctors did not question or understand the transactions taking place and, often times, critical information was added to the authorization forms only after the doctors' signatures were obtained. The evidence established that the doctors did not even learn that "something was awry" (*see Martin v. Consultants & Adm'rs, Inc.,* 966 F.2d 1078, 1086 (7th Cir.1992)) until Theresa Jones, Dr. Ordonez's secretary, ascertained that Meszaros was no longer employed by Berkshire and that tax returns had not been filed for the plans. At trial, Jones testified that she learned

Meszaros was no longer employed by Berkshire in June 1996, and that she communicated her concerns to Dr. Ordonez soon thereafter.[33] The evidence established that the plaintiffs did not have actual knowledge of the defendant's breach by April 27, 1996, and hence, the suit is not time-barred by virtue of the three-year statute of limitations in 29 U.S.C. § 1113(2).[34]

▮ Because the three-year statute of limitations and the fraud or concealment exception are not applicable in this case, the six-year statute of limitations period applies and runs from the date of the breach or violation. *See, e.g., Gruby v. Brady,* 838 F.Supp. 820, 830 (S.D.N.Y. 1993) (citing *Fink,* 772 F.2d at 956); 29 U.S.C. § 1113(1). At trial and in its post-trial memorandum, Berkshire has persuasively supported its contention that the plaintiffs cannot recover damages arising from any breaches that occurred prior to April 27, 1993, which is six years before the filing of the complaint in this action. (*See, e.g.,* Def. Berkshire Life Insurance Company's Post–Trial Mem. at 11–13); *see also Fink,* 772 F.2d at 956–58 (holding that in a case alleging that the defendants breached their fiduciary duties by making investments without independent investigation, the plaintiffs may recover only for those breaches that occurred within six years of the filing of the complaint); *Gruby,* 838 F.Supp. at 830–31 (finding that since the defendants' failure "to monitor the Fund's financial condition . . . gave rise to a new cause of action each time the Fund was injured," the plaintiffs could re-

**33.** The amended complaint alleges that Jones encountered problems in obtaining a loan from the plan in approximately May 1996 or soon thereafter. (Am. Compl. at ¶ 36.)

**34.** Berkshire stated that laches requires a showing of, *inter alia,* "unreasonable delay in asserting a known right." (Def.'s Pretrial

Mem. Regarding Damages at 7) (citing cases). Given the court's finding that the plaintiffs did not have actual knowledge of the defendant's breach until May 1996 at the earliest, there was no unreasonable delay in bringing this suit.

cover only for those breaches occurring within six years of the commencement of the suit); *Starr v. JCI Data Processing, Inc.*, 767 F.Supp. 633, 636–38 (D.N.J.1991) (ruling that although the complaint asserted violations occurring over a thirteen-year period, the plaintiff could only recover for those breaches that occurred in each of the six years preceding the filing of its complaint because "each year that [the defendant] maintained its pension plan without complying with the various aforementioned provisions of [ERISA], it breached its fiduciary duty to maintain the plan solely in the interest of plan participants and beneficiaries"); *Hunt v. Magnell*, 758 F.Supp. 1292, 1298–99 (D.Minn. 1991) (holding that the purchase of an imprudent investment without prior investigation is "the last action which constituted a part of the breach or violation" and, hence, claims arising from any asset purchases that occurred more than six years prior to the filing of the complaint were time-barred); *Buccino v. Cont'l Assurance Co.*, 578 F.Supp. 1518, 1521 (S.D.N.Y.1983) (reasoning that the defendants' failure to maintain prudent investments "gave rise to a new cause of action each time the Fund was injured" and, thus, "[o]nly those violations that occurred more than six years before this action was filed are time barred"); *cf. Cecil v. AAA Mid–Atl., Inc.*, 118 F.Supp.2d 659, 667–68 (D.Md.2000) (holding that the statute of limitations begins anew for each breach in a series of successive breaches).

As noted, the plaintiffs alleged and proved breaches of fiduciary duties by virtue of the defendant's churning and failure to diversify the plans' assets. The plaintiffs commenced their lawsuit in a timely fashion because the defendant committed these breaches from 1983 until the time that its relationship with the doctors ended sometime in 1997. The plaintiffs may recover damages, however, only for those breaches that occurred after April 27, 1993 (six years prior to the filing of this action).

### IV. Loss, causation, and damages

Pursuant to 29 U.S.C. § 1109(a), "Any person who is a fiduciary with respect to a plan who breaches any of [his] responsibilities, obligations, or duties . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." The plaintiffs bear the burden of demonstrating a prima facie case of loss. *See, e.g., McDonald*, 60 F.3d at 237; *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 919–20 (8th Cir. 1994); *Martin v. Feilen*, 965 F.2d 660, 671–72 (8th Cir.1992). While section 1109 limits claims "to those which inure to the benefit of the plan as a whole rather than to individual beneficiaries," *McDonald*, 60 F.3d at 237, " 'losses to the plan' in § 1109 [should be construed] broadly in order to further the remedial purposes of ERISA." *Roth v. Sawyer–Cleator Lumber Co.*, 61 F.3d 599, 604 (8th Cir.1995) (citations omitted). *See also Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243 (2d Cir.1989) (holding that, "If, but for the breach, the Fund would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable"); *Davidson v. Cook*, 567 F.Supp. 225, 240 (E.D.Va. 1983), *aff'd*, 734 F.2d 10 (4th Cir.1984) (noting that "the Fund has been deprived of economic opportunities by having virtually all of its assets tied up in this inferior investment" and that "[o]ne type of loss" under section 1109 is that "the Fund today holds an investment whose value is significantly less than the value prudent investments would bear").

The plaintiffs proved that each of the plans suffered a loss. In addition to life insurance policies, the plans' assets were placed almost exclusively in low-yielding annuities. Further, the plans were as-

sessed numerous surrender fees, charges, and commissions. As a result, the plans held investments with values "significantly less than the value prudent investments would bear." *Davidson,* 567 F.Supp. at 240; (*see, e.g.,* Dodge Tr. 3/21/02 at 382, 387–88, 391, 398–401; MacNab Tr. 4/16/02 at 149–53; Logan Tr. 4/16/02 at 14–20 (Logan conceding that the plans were invested even more conservatively than his most conservative category).)[35]

The plaintiffs also proved that the losses to the plan were proximately caused by Berkshire's breaches of its fiduciary duties. The Fourth Circuit has not yet specified which party bears the burden of proving proximate causation between breach and loss. Of the circuits that have addressed the issue, some have employed a burden shifting approach, while others have not. *See, e.g., McDonald,* 60 F.3d at 237 (ruling that once the plaintiff has proven a breach of fiduciary duty and a prima facie case of loss to the plan, " 'the burden of persuasion shifts to the [defendant] fiduciary to prove that the loss was not caused by ... the breach of duty' ") (citations omitted); *Roth,* 16 F.3d at 919–20 (same); *Martin v. Feilen,* 965 F.2d at 671–72 (same) (citing cases); *but see Silverman v. Mut. Benefit Life Ins. Co.,* 138 F.3d 98, 104 (2d Cir.1998) (holding that 29 U.S.C. § 1109(a) "requires a plaintiff to demonstrate ... that the plan's losses 'result[ed] from' " the breach by proving "some causal link" between the breach and the plaintiff's loss) (citations omitted) (alteration in original); *Kuper v. Iovenko,* 66 F.3d 1447,

1459–60 (6th Cir.1995) (stating that the "plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan").

Regardless of which party bears the burden, the court holds that the evidence conclusively established that Berkshire's breaches proximately caused the losses to the plans. Stated another way, the plaintiffs carried the burden of proving a causal link between Berkshire's breaches and the plans' losses, whether or not they were required to do so. It was Meszaros's decision to invest the plans' assets in an extremely conservative fashion. It was also Meszaros's decision to churn the plans' assets, generating exorbitant fees, charges, and commissions in the process. Although the doctors authorized many of these decisions, as previously stated, they did so in full reliance on Berkshire's advice and without complete information or understanding. Accordingly, the court finds that Berkshire's breaches proximately caused the plans' losses.

Given the foregoing findings of fact and conclusions of law, the only issue left to be decided is the extent of damages. The Fourth Circuit has not squarely addressed which party bears the burden of proving damages in an ERISA case involving breach of fiduciary duty. In *Brink v. DaLesio,* 667 F.2d at 426, the Fourth Circuit held that the district court erred when it placed the burden on the plaintiff to prove the extent of losses sustained.

---

**35.** The defendant's primary argument with respect to loss is that, "In the absence of a specific investment policy or goal having been established by the trustees themselves, there can be no loss to the plan from the failure to reach a nonexistent goal or to follow a nonexistent investment policy." (Def. Berkshire Life Insurance Company's Post–Trial Mem. at 10.) At the initial meeting, however, Meszaros and Walsh predicted that each of the plans would be worth approximately $2 million by the time each doctor retired, and this was acceptable to the doctors. Even if this is not considered a specific investment goal, the cases do not require such a showing. The plaintiffs have established losses to the plan, as explained above, by showing that the value is less than what a prudent course of investment would have obtained.

Rather, "[i]t is generally recognized that one who acts in violation of his fiduciary duty bears the burden of showing that he acted fairly and reasonably." *Id.* (citing cases). Although the plaintiffs in *Brink* raised ERISA claims, the burden analysis excerpted above pertained to the district court's analysis of the plaintiffs' claims brought under the Labor–Management Reporting and Disclosure Act of 1959. *Id.* Nevertheless, other courts have cited *Brink* for the proposition that the ERISA defendant bears the burden of proving the extent of any loss sustained by the plaintiff. *See, e.g., New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno,* 18 F.3d 179, 182–83 (2d Cir.1994) (applying the *Brink* analysis in the ERISA context); *Leigh v. Engle,* 727 F.2d 113, 138–39 (7th Cir.1984) (citing *Brink* for the proposition that the burden of proof lies with the ERISA defendant to show that a prohibited transaction did not damage the trust). In reaching this conclusion, the *Leigh* court emphasized that the "primary purpose of ERISA is to protect the interests of plan beneficiaries" and that section 1109 "would be of little value if ... beneficiaries confronted an insurmountable obstacle in proving the extent of a fiduciary's profits." 727 F.2d at 139.

■■■■ As the parties agree, the proper measure of damages is the difference between the actual value of the plans and the "value prudent investments would bear." *Davidson,* 567 F.Supp. at 240; (*see, e.g.,* Pls.' Pre–Trial Bench Mem. at 9)

(The plaintiffs "are entitled to recover the difference between the actual performance of the pension Plans and the performance that would have been achieved under an appropriate and well managed Plan"); Pls.' Post–Trial Br. at 11 ("damages seek to place the plans in the position they would have occupied but for the breach"); Def.'s Pretrial Mem. Regarding Damages at 4–5 ("Such loss should be determined by comparing the return earned on the imprudent investment with the return that would have been earned on the investment or investments that would have been made in the absence of the imprudent investment").[36]

■■■■ While awards may not be speculative, *see, e.g., Carras v. Burns,* 516 F.2d 251, 259 (4th Cir.1975), the court may approximate the extent of damages. *See, e.g., Martin v. Feilen,* 965 F.2d at 672 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). It has been extremely difficult to retrace the transactions made on behalf of the plans in this case; even the defendant's witnesses acknowledged as much. (*See* O'Malley Tr. 3/22/02 at 540, 547–50; Logan Tr. 3/22/02 at 615.) This confusion is a direct result of Meszaros's haphazard asset transfers, and accordingly, the court grants the plaintiffs some leeway in connection with their damages calculations. Further, as Berkshire is a fiduciary which breached its duties, "[a]ny doubt or ambiguity should be re-

---

**36.** The plaintiffs also assert, however, that the "court must assume that, were it not for the Defendant's breach, the Plans [sic] assets would have been invested in the most profitable manner possible." (Pls.' Pretrial Bench Mem. at 10) (citing, *inter alia, Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985)). This contention reflects a misunderstanding of the proper damages standard. When determining the position the plans would have occupied but for the breaches, the court

"should presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Donovan,* 754 F.2d at 1056. Thus, in this case, the court should determine what the plans would be worth if the funds had been invested prudently and consistently with the plans' purposes. "Plaintiffs must be denied a windfall but must receive the benefit of such reasonable doubts as appear." *Leigh v. Engle,* 727 F.2d 113, 139 (7th Cir.1984).

solved against [it]." *Donovan*, 754 F.2d at 1056. Finally, it is significant that Berkshire has provided no damages calculations of its own. Berkshire has made no attempt to justify the fairness or prudence of any of its investment decisions, commissions, or charges, except to say that a 5% to 7% rate of return is reasonable, which has already been rejected by the court. Accordingly, the only substantial evidence presented on the extent of damages is that offered by the plaintiffs' experts; as was the case with the proximate causation analysis, the plaintiffs carried the burden of proof, whether or not they were required to do so. *Brink*, 667 F.2d at 426.

In order to select a fair damages calculation, the court must determine what asset mix a prudent fiduciary would have maintained for the doctors' plans during the 1993 to 1997 time frame. MacNab explained that as of 1983, all of the plan participants had at least eleven years until retirement (Doctors Meyer and Ordonez had fifteen and nineteen years, respectively). (Pls.' Ex. 106.) Because this is considered a "long term time horizon," MacNab stated that it would have been reasonable to pursue a "moderate" risk investment strategy, which she defined as an asset allocation consisting of 70% equity and 30% income. (Pls.' Ex. 106; MacNab Tr. 4/16/02 at 160.) MacNab further testified that it would have been reasonable to maintain a 70% equity, 30% income asset mix at all times in question, including the 1993 to 1997 time frame, as the participants neared retirement. (MacNab Tr. 4/16/02 at 160–61.) Logan, on the other hand, opined that the plans' assets were appropriately invested conservatively (approximately 10% equity and 90% income) because the doctors themselves prescribed such an investment strategy. (Logan Tr. 4/16/02 at 22–25.) As noted, however, the court finds that the doctors did not prescribe the investment strategy; rather, they deferred entirely to Meszaros, who made all of the investment decisions. Notably, even Logan testified repeatedly that an asset allocation of 50% equity and 50% income is considered "moderate." (Logan Tr. 3/22/02 at 593–95; Logan Tr. 4/16/02 at 15.) While Dodge testified at trial that a 50% equity, 50% income asset mix would have been too conservative for the plans (Dodge Tr. 3/21/02 at 424–25), he conceded on cross-examination that at his deposition, he testified that he would have suggested investing the funds pursuant to a 50% equity, 50% income allocation. (Dodge Tr. 3/21/02 at 442–43.) Considering the testimony and evidence as a whole, the court concludes that a moderate asset mix consisting of approximately 50% equity and 50% income for the 1993 to 1997 time period would have been prudent.

MacNab estimated that an asset allocation consisting of 50% equity and 50% income had an expected rate of return "just shy of 9%" (although she could not say over what specific time period) and an actual rate of return of approximately 10% to 12% from 1993 to 1997. (Pls.' Post–Trial Br. at 13; MacNab Tr. 4/16/02 at 135, 138–39; MacNab Tr. 4/26/02 at 661–62; Pls.' Ex. 106.)[37] The court finds that it would have been reasonable to achieve a 10% to 12% rate of return on the plans' investment components during the 1993 to 1997 time frame, given the market's performance at that time. (*See* Dodge Tr. 3/21/02 at 426; *see also* Pls.' Post–Trial Br. at 13) (estimating the rates of return of the

---

**37.** Dodge estimated that a 50% equity, 50% income asset mix yielded a 13.83% rate of return from 1993 to 1997. (Pls.' Ex. 88, 89.)

MacNab's estimated rates of return are more closely aligned with Berkshire's own projected rates of return, as will be discussed later.

S & P 500 at approximately 17.4% and the Lehman Brothers Government/Corporate Bond Index at approximately 7.6% during the 1993 to 1997 period). Significantly, Berkshire itself predicted various rates of return for the plans, ranging from 8% to 12%. (*See* Logan Tr. 3/22/02 at 641–42; Pls.' Ex. 99 (Berkshire predicting a pre-retirement rate of return of approximately 8% "to reflect the diversification in your portfolio" and an estimated 11% rate of return for the plans' investment component); Logan Tr. 4/16/02 at 4–6; Def.'s Ex. 4 (Berkshire comparing the doctors' former investment strategy with a Berkshire pension plan and using a 10% assumed rate of return for the investments in the Berkshire plan); Logan Tr. 4/16/02 at 4–6; Def.'s Ex. 5, 6 (Berkshire assuming that the investment component of Dr. Ordonez's plan would grow at various rates of return, including 8%, 10.26%, 11%, and 12%); Logan Tr. 4/16/02 at 6–7; Def.'s Ex. 47 (Berkshire assuming that the investment component of Dr. Meyer's plan would grow at various rates of return, including 8%, 10.21%, 10.97%, and 12%); Logan Tr. 3/22/02 at 640; Logan Tr. 4/16/02 at 5, 10 (testifying that Berkshire guaranteed a 12% rate of return for the first five years on the Berkshire annuity program).)

Although the court finds, considering all the testimony, that a prudent fiduciary would have invested the assets pursuant to a 50% equity, 50% income mix for the 1993 to 1997 time frame, it cannot accept the plaintiffs' assertion that, in this case, *all* of the plans' assets should have been invested in this manner. The doctors understood from 1983 forward that life insurance was a required component of Berkshire's pension plans; in fact, one of the reasons they

chose Berkshire was that it did not charge an administrative fee for its services in exchange for the insurance requirement. Because the court finds that, aside from the life insurance policies, the plans' assets were churned and invested imprudently, it will impose damages to remedy the losses incurred to the plans' investment components only.

The court, thus, holds that MacNab's damage models pertaining to the 1993 to 1997 time period for "non-insurance only" should be used. (*See* Pls.' Post–Trial Br. at 14.) Remembering that the proper measure of damages is the difference between the investments' actual value and the "value prudent investments would bear," *Davidson*, 567 F.Supp. at 240, MacNab calculated that if 50% of the plans' remaining (i.e., non-insurance) funds had been invested in equity and 50% in income from 1993 to 1997, Dr. Meyer's plan would have been worth $1,777,688 and Dr. Ordonez's plan would have been worth $1,625,697. (Pls.' Post–Trial Br. at 14.) The differences between these figures and the plans' actual values represent the damages incurred by the plans: $664,968 for Dr. Meyer's plan and $631,277 for Dr. Ordonez's plan. (Pls.' Post–Trial Br. at 14.)

Finally, the court holds that the plans are entitled to pre-judgment interest on these amounts from January 1, 1998 to the present.[38] In *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030–31 (4th Cir.1993), the Fourth Circuit held that the district court, in its discretion, may award pre-judgment interest to a prevailing party in an ERISA case; the rate of pre-judgment interest is also left to the discretion of the district court. The court finds that pre-judgment interest is needed to ensure

---

**38.** A precise ending date for the plans has not been identified (*see, e.g.,* MacNab Tr. 4/26/02 at 690), but the damage calculations by both Dodge and MacNab appear to have been carried through the end of 1997. (*See* Pls.' Post–Trial Br. at 14; Pls.' Ex. 88, 89.)

that the plaintiffs are fully compensated for their loss. *See Fox v. Fox*, 167 F.3d 880, 884 (4th Cir.1999) (affirming the district court's award of pre-judgment interest at the rate of 12%, which was based on the reasonable rate of return of a balanced portfolio during the relevant time period); *Gruber v. Unum Life Ins. Co. of Am.*, 195 F.Supp.2d 711, 719 (D.Md.2002) (awarding pre-judgment interest at the rate of 6%, based, in part, on Maryland's legal rate of pre-judgment interest of 6%). Considering the 6% baseline, as well as Berkshire's own estimates that a reasonable rate of return for the plans was between 8% and 12% (*see, e.g.*, Pls.' Ex. 99; Def.'s Ex. 4–6, 47), the court finds that pre-judgment interest at the rate of 8% per annum is needed to fully compensate the plans for their losses.

Accordingly, the court orders that, in addition to the sums listed above, the plans shall receive pre-judgment interest at the rate of 8% per annum.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. judgment is entered in favor of the **plaintiffs, in the amounts of $664,968 plus pre-judgment interest at the rate of 8% per annum from January 1, 1998 to the date of this Order** for Alan Meyer, Trustee for Paul D. Meyer, M.D., P.A. Money Purchase Pension Plan and Trust, and **$631,277 plus pre-judgment interest at the rate of 8% per annum from January 1, 1998 to the date of this Order** for Jorge R. Ordonez, M.D., Trustee for Jorge R. Ordonez, M.D., P.A. Employee Profit Sharing Plan and Trust, successor to Jorge R. Ordonez M.D. Money Purchase Pension Plan and Trust;

2. the plaintiffs also are entitled to post-judgment interest on the entire award under 28 U.S.C. § 1961;

3. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

4. the Clerk of Court shall **CLOSE** this case.